# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **QBE INSURANCE CORPORATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case Number:** |
| ) | **2:08-cv-2347-PWG** |
| **BLOUNT MEDICAL CENTER** ) | |
| **PARTNERS c/o TOM HACKNEY,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

In this action, QBE Insurance Corporation (hereinafter "QBE") seeks a declaratory judgment establishing that it is not further obligated under a commercial property policy to cover damage suffered by its insured, Blount Medical Center Partners ("BMCP"). The court is authorized to hear the action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202, and the diversity statute, 28 U.S.C. § 1332. The cause is now before the court on QBE's motion for summary judgment (Doc.[1] 16), which is now ripe for decision.[2] The court concludes that QBE's motion for summary judgment is due to be granted.

## I.      BACKGROUND

BMCP owns a medical building in Oneonta, Alabama. BMCP obtained from QBE a commercial property insurance policy (the "Policy"), with coverage limits of $500,000 for the

---

[1]      References to "Doc(s).____" are to the documents as numbered by the clerk of court in the court's record of the case.

[2]      The parties have consented to exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1). (Doc. 11).

BMCP building and $200,000 for the contents thereof.  On April 19, 2006, a storm that included large hail, high winds, and rain caused extensive damage to the BMCP Facility and its contents, including severe damage to the roof, awnings, and air conditioner unit.  The damage to the roof allowed water damage to the interior, destroying drywall, carpeting, shelving, cabinetry, medical equipment, files and supplies located within the building.

On April 27, 2006, BMCP gave notice of the loss to Anchor Managing General Agency, Inc. ("Anchor"), a third-party administrator for QBE.  Anchor, in turn, retained Fountain-Keat-Sanders & Associates ("FKS") to investigate and adjust the loss, a task assumed by FKS Senior Adjuster James Keat.  FKS immediately hired Servpro, a company to perform clean-up work at the site, and the next day, Servpro began extracting water; damaged ceiling tiles, sheet rock, and carpeting; and other debris.  Shortly thereafter FKS hired Alabama Roofing General Contractors ("Alabama Roofing") to inspect the roof damage and provide an estimate for the cost of repairing it.  Because of the unsecured state of the roof, however, water continued to pour into the interior building with subsequent days of rain.  In light of this, FKS ordered Servpro to cease its clean-up of the interior after twelve days on the job, with the expectation that the company would need to be recalled after the roof was replaced.  In its first report updating Anchor on the status of the claim, dated May 10, 2006, FKS indicated, however, that "[o]nce all of the initial extraction was done and the debris was taken out, there was very little more that could be damaged."  (QBE Exh.[3] B1, QBE00130).  In its second report, dated May 19, 2006, FKS similarly stated that "the majority of the interior damages

---

[3]    Citations herein to "QBE Exh. ___" are to the corresponding evidentiary exhibits attached to QBE's Memorandum of Law in Support of Its Motion for Summary Judgment, Doc. 17.

had already been removed and therefore it should not cause any major problem to have called Servpro off the scene." (QBE Exh. B2, QBE00146).

In that same second report to Anchor, FKS recognized that Alabama Roofing had completed its review and determined that the replacement cost for the roof was $61,084.74. Because the Policy provided for coverage based upon "actual cash value,"[4] FKS requested a check payable to BMCP in the amount of $44,813.53 for the roof damage, representing the replacement cost figure reduced by $15,271.21 for depreciation and by another $1,000.00 for the policy deductible. FKS also requested a second check, in the amount of $71,947.52 payable to Servpro for its twelve days of work. On or about June 15, 2006, FKS faxed a prepared proof of loss ("POL") form to Tom Hackney, BMCP's authorized representative, acknowledging a claim in the amount of $116,761.05, which represented the combined amount of the payments to be made respectively to BMCP for the roof damage and to Servpro for its clean-up efforts. By June 22, 2006, FKS had received both of the requested checks and had forwarded the one payable to Servpro. Because Hackney had yet to sign and return the POL, however, FKS continued to hold the check made out to BMCP for the roof repair.

On July 25, 2006, FKS acknowledged in its fourth report to Anchor that the roof had been secured and that Servpro had been recalled to perform "final mitigation" clean-up work upon the building interior, at a cost of $8,196.20. In actuality, BMCP had only put a temporary type roof on the building, as Hackney was considering framing it and installing a metal roof. In any event, QBE

---

[4] A "replacement" policy, as the term implies, covers the full cost of replacing damaged property, regardless of wear and tear. By contrast, "actual cash value" policies afford lesser coverage because they pay only the market value of the property, generally calculated as the replacement cost reduced by depreciation. (*See* QBE Exh. J, "Alabama Changes – Actual Cash Value"); *see also generally Ballard v. Lee*, 671 So. 2d 1368, 1374-75 (Ala. 1995) (discussing the definition of the term "actual cash value"), overruled on other grounds, *State Farm Fire and Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998).

issued a check to Servpro in that amount, which FKS forwarded.  By August 24, 2006, BMCP had

provided to FKS a signed and sworn copy of the POL that FKS had previously prepared.  On that

POL dated June 22, 2006 (hereinafter the "First POL"), Hackney signed on behalf of BMCP.  On

a line on the form indicating that the amount of "THE WHOLE LOSS AND DAMAGE" was

$117,761.05, Hackney drew a line through the word "WHOLE" and hand-wrote above it the word

"Partial." (QBE Exh. D, QBE00194).  Hackney testifies that he did so because the amount specified

"caused [him] great concern" because "there was still a substantial amount of work to be completed

to repair the damage to the BMCP Facility."  (Affidavit of Thomas Hackney ("Hackney Affidavit"

or "Hackney Aff."), BMCP Exh. A, Doc. 20-1, ¶¶ 10).  Indeed, it is clear from the record FKS

actually also contemplated that the "amount claimed" on the June 2006 POL form, $116,761.05,

represented only part of BMCP's loss, for the roof and Servpro's completed work.  (Affidavit of

James A. Keat ("Keat Affidavit" or "Keat Aff."), QBE Exh. C, ¶¶ 4-5).  However, to the extent it

is material, it is not clear that Hackney would or should have understood that to be the case at the

time.  The POL form, as prepared by FKS, did not disclose that it was intended to cover only

particular damage or a part of the loss, and any correspondence that might have accompanied the

POL form when mailed to Hackney is not in the record.

        FKS proceeded thereafter to obtain an estimate on the cost of repairs to the interior of the

building.  After receiving that estimate, which was in the amount of $120,180.57 on a replacement

cost basis, FKS advised Anchor that such amount was due to be reduced based upon a depreciation

calculation of $22,602.91, yielding an actual cash value of $97,577.66.  On August 26, 2006, QBE

prepared a check payable to BMCP in that latter amount and sent it to FKS.  In correspondence to

Hackney dated September 9, 2006, FKS enclosed a POL form, which was expressly disclosed as

corresponding to a loss in the amount of the check, "for the 'put back of the interior areas after depreciation has been applied," and a copy of two estimates for such interior work. (BMCP Exh. B, Doc. 20-2, BMCP 00009 to 00036). The letter requested that Hackney sign and return that POL form (hereinafter the "Second POL," BMCP Exh. B, BMCP 00010), and in exchange FKS would forward the check "for the most recent payment" on BMCP's claim. The letter further noted that the "final portion of your claim is that of the contents" of the building, and it requested that Hackney "provide a detailed listing of the damaged contents along with invoices or receipts documenting values." (*Id.*)

At this point, the claims process essentially came to a halt for a period of 15 months as Hackney ignored FKS's repeated attempts, both by telephone and by mail, to contact him about the claim. (*See* QBE Exh. B6 to B20). In those communications, FKS told Hackney that he needed to sign and return the Second POL in order to receive the second proceeds check and that he needed to provide an inventory of any building contents that he was claiming were lost. From September 2006 and end of 2007, however, the only contact that FKS was able to have with Hackney occurred on April 9, 2007 and July 24, 2007, and on neither occasion did he provide any material information on the claim. On April 9, 2007, Hackney called and stated that he could not find any of his paperwork on the claim. The same day, FKS sent him another copy of the "second" POL, acknowledging the claim for $97,577.66 related to the remaining building repairs; a copy of the estimate for such repairs; and content inventory worksheets. Hackney was again advised that he needed to have the POL properly signed and notarized so that a payment could be re-issued. (QBE Exh. 13). With regard to content losses, he was reminded that he should send any documentation he had, such as invoices, with the inventory list and that, for any item over $500.00, FKS would need

5

proof of its value, such as quotes for replacement, catalog pages, or photographs.  On July 24, 2007, Hackney similarly called FKS's offices after hours and left a message requesting that a copy of what was the Second POL be faxed to Hackney's office in Birmingham.  (QBE Exh. B16).  The next day, FKS complied with that request, also including a copy of FKS's April 9, 2007 letter to him. Nonetheless, the remaining five months of 2007 came and went without FKS receiving any communication from Hackney, despite additional attempts by FKS to contact him.  (*See* QBE Exh. B16-B22).

On January 2, 2008, William Barrett, a claims examiner for Anchor, sent a letter to Hackney pointing out that FKS had been attempting to resolve BMCP's claim for approximately 18 months, without completing the process, and reminding Hackney of post-loss obligations he had as the insured under the Policy.  (QBE Exh. E).  These obligations included that Hackney was required to send a signed, sworn POL containing requested information within 60 days after being asked to do so by the insurer and to cooperate in the investigation or settlement of the claim.  (*Id.*)  Barrett warned that if Hackney failed to provide the POL and other information as requested, his claim would be closed on February 4, 2008, based on his lack of cooperation and violation of his policy conditions.  (*Id.*)  Within a few days thereafter, FKS was contacted on Hackney's behalf by Caroline Lenderman at Cade CPA in Birmingham, who indicated that her firm was going to assist FKS in obtaining a POL from Hackney.  (QBE Exh. B22).  FKS forwarded another copy of the Second POL with supporting documentation to Lenderman.  The next contact made on Hackney's behalf was on February 1, 2008, when an attorney, R. Marcus Givhan, called Anchor's office.  (QBE Exh. F, QBE00250).   At that time, Givhan requested and received a 30-day extension of the February 4, 2008 deadline stated in Barrett's January 2, 2008 letter to Hackney.  (*Id.*)

On March 5, 2008, Gina Pearson-Hines, another attorney at Givhan's firm, sent correspondence to Anchor that included an unsigned POL form and an "itemized list of the loss." (QBE Exh. G, QBE00281 to 00284). On that unsigned POL form (hereinafter the "March 2008 POL"), the amount claimed to be due from QBE was $645,300.00. On the enclosed "itemized list," that total was broken down into the following amounts and categories:

| | | |
|---|---|---|
| * | $4,000 | Additional Clean Up, removal and disposal of remaining sheetrock and ceiling tiles, "[d]ue to incomplete cleanup conducted by Serve Pro (sic)" |
| * | $247,000 | Estimate provided by Jeff Tidwell Construction for repair and replacement construction of the building interior and several exterior items: |

* replace three awnings
* repair broken windows
* replace approx. 40 ft. of medical record shelving
* strip all sheetrock and paneling 4 feet from floor
* repair all flooring
* replace all 2x2 ceiling tiles
* pull up remaining carpet
* replace all doors as needed
* repair gutters and downspouts
* replace 22x2 florescent lights

| | | |
|---|---|---|
| * | $18,300 | "Specialized Repair Construction," comprised of |

* electrician and supplies  $5,000
* plumber and supplies  $3,000
* painting and supplies  $6,400

| | | |
|---|---|---|
| * | $242,000 | Medical Equipment with "estimated values" |

* ultrasound machine $45,000
* two cardiac monitors $22,000
* Zeiss Surgical Microscope $52,000
* Dimension lab machine $10,000
* Nuaire Biological/Chemotherapy hood $35,000
* 2 Pack warmer $3,000
* 10 Packs $500
* 2 PT tables $2,400
* 1 large PT tale with pad $3,000

|  | * | 4 Exercise units $3,600 |
|  | * | 1 GXT with treadmill and monitor $65,000 |

*    $1,500     Locksmith services and supplies

*    $132,500   "Additional Property" comprised of:
  * "Office Furniture with estimated value of $35,000"
  * "Repair and resecure temporary roof improperly secured @ $55,000"
  * "Replace approximately 250 ft. of base and wall cabinets @140/ft=$35,000
  * "Repair air conditioner damaged in storm and not previously noted by adjuster @$7,500"

(QBE Exh. G, QBE00283-00284). This correspondence did not include any additional documentation on the estimated costs or values presented on the list.

On March 26, 2008, Barrett, on behalf of Anchor and QBE, sent a letter to Pearson-Hinds acknowledging receipt of the March 2008 POL. (QBE Exh. I, QBE00286-00287). In that letter, Barrett states that the POL was rejected as submitted, on the grounds that it both was unsigned and "indicates damages far above any damages identified by our original inspections." Barrett further stated that FKS would contact Pearson-Hinds for the purpose of setting up an inspection, which would require that the insured make available both someone with sufficient knowledge of the claim, as well as all items of personal property claimed to be damaged. The letter concluded by noting that the insurer reserved all of its rights under the terms of the Policy.

On April 2, 2008, FKS sent a letter to Pearson-Hinds recognizing that it was imperative that all parties meet at the building site in Oneonta to review the damages and repairs that had been made. (QBE Exh. B24, QBE00275-00276). That correspondence further advised that FKS's adjuster, Keat, had been in the area on March 31, 2008 and looked at the building from the outside. At that time he noted the building itself was unlocked with the front door actually ajar several inches and

that a fixed glass window at the rear had been broken out "obviously for some period of time," allowing water to blow in.  FKS concluded by asking for a list of dates to meet with Pearson-Hinds, Hackney, and a contractor of Hackney's choice.  Also on April 2d, FKS sent a report to Anchor advising of the status of the claim, recognizing that the "building has suffered more extensive damage since the loss due to the negligence of the insured."  (QBE Exh. 25, QBE00274).  In particular, FKS noted that, in addition to the unsecured state of the building and the broken window, a "partial roof that has been placed on the building appears to be new; however, you can note from the flashing area around the rear of the building that no roof is in place and that the old flashing has been removed damaging bricks in the process."  (*Id.*)

On April 22, 2008, Pearson-Hinds sent a letter to FKS acknowledging that FKS had asked Hackney's contractor to review the prior estimates related to repair and reconstruction of the building interior.  Pearson-Hinds further wrote: "We will be happy to accommodate this request.  Please forward me a copy of the internal estimate and we will schedule a meeting for you to discuss the estimate with Mr. Hackney's contractor, with Mr. Hackney and myself present."  (QBE Exh.  B25, QBE00289).  The following day, April 23, 2008, FKS complied, sending a copies of the two prior estimates.  On June 3, 2008, having not heard from Hackney or his attorney, FKS sent a letter to Hackney's counsel asking that she advise whether Hackney's contractor had reviewed the estimates and when all parties might meet at the site in Oneonta.  (QBE Exh. B26, QBE00291).  Still having received no reply, FKS sent another similar letter on July 31, 2008.  (QBE Exh. B28, QBE00294), but as of September 2, 2008, there had still been no word from Hackney or his counsel since the latter's letter dated April 22, 2008.

On December 16, 2008, QBE filed suit in this court, seeking a declaratory judgment that it has no further obligations to BMCP with regards to the claim. (Complaint for Declaratory Judgment Insurance Policy Does Not Afford Coverage, Doc. 1 ("Complaint" or "Compl.")). QBE now moves for summary judgment, arguing that BMCP failed to comply with post-loss duties of the Policy. Specifically, the "Building and Personal Property Coverage Form" part of the Policy provides in relevant part:

> **E.   Loss Conditions**
> The following conditions apply in addition to the Common Policy conditions and the Commercial Property Conditions.
>
> * * *
>
> **3.   Duties In The Event Of Loss Or Damage**
> **a.** You must see that the following are done in the event of loss or damage to Covered Property:
>
> * * *
>
> **(4)**   Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.
> **(5)**   At our request, give use complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.
> **(6)**   As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.
> **(7)**   Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do

this within 60 days after our request.  We will supply you with the necessary forms.

**(8)**   Cooperate with us in the investigation or settlement of the claim.

\* \* \*

**4.**   **Loss Payment**

\* \* \*

**g.**  We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

**(1)**   We have reached agreement with you on the amount of the loss; or

**(2)**   An appraisal award has been made.

(The Policy, QBE Exh. J, "Building and Personal Property Coverage Form," pp. 9 & 10 of 14).

The "Commercial Property Conditions" part of the policy further provides in relevant part:

**D.**   **LEGAL ACTION AGAINST US**
No one may bring a legal action against us under this Coverage Part unless:

**1.**   There has been full compliance with all of the terms of this Coverage Part ... .

(*Id.*, "Commercial Property Conditions," pp. 1 of 2).

## II.   STANDARD OF REVIEW

"Disposition of a summary judgment motion in a declaratory judgment action is governed by the same basic principles that generally rule the grant or denial of such a motion."  *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984).  Rule 56(c)(2), Fed. R. Civ. P., provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The substantive law will identify which facts are

material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1437 (11th Cir. 1991) ("*Four Parcels*") (quoting *Anderson*, 477 U.S. at 248, 251-52).

> The party moving for summary judgment bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

Once the moving party has met its burden, Rule 56(e), FED. R. CIV. P., "requires the nonmoving party to go beyond the pleadings and by affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.* "[T]he judge's function is not himself to weight the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Accordingly, in its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

### III.   DISCUSSION

QBE contends that it is entitled to a summary judgment on its claim seeking a declaration that it has no further coverage obligations based upon BMCP's failure to abide by its post-loss duties under the Policy.   Specifically, QBE argues that any further performance on its part is due to be excused because BMCP, through its authorized representative, Hackney, breached the Policy by refusing or otherwise failing: (1) to cooperate in the investigation and adjustment of the claim; (2) to furnish a proof of loss that was both signed and sworn; (3) to provide requested documentation on the claim; and (4) to adequately protect the building and its contents from further damage.   BMCP responds that QBE's motion for summary judgment is due to be denied, contending that the evidence demonstrates disputed issues of fact regarding whether BMCP complied with the cooperation, documentation, mitigation, and proof-of-loss requirements of the Policy, as well as whether QBE suffered prejudice as a result of any failure to comply that might have occurred.

The parties at times blur distinctions between particular post-loss duties, lumping them into a broad category of "cooperation" or "post-loss policy requirements."   Such an approach may be warranted insofar as  "cooperation" in this context may encompass different types of conduct on the part of the insured, including provision of timely notice and truthful information on the circumstances underlying the claim; provision of documents, records, and other necessary proof of loss; allowing the insurer to inspect premises or examine property; and submission to questioning under oath.   *See* 14 Couch on Ins. 3d, § 199.2.   Further, the Alabama Supreme Court has stated broadly that "an insurer's obligation to pay or to evaluate the validity of an insured's claim does not arise until the insured has complied with the terms of the contract with respect to submitting claims." *Nilsen*, 745 So. 2d at 267.   However, under governing Alabama insurance law, *see World Harvest*

*Church, Inc. v. Guideone Mut. Ins. Co.*, 586 F.3d 950, 956 (11th Cir. 2009); *United States Fire Ins. Co. v. Watts*, 370 F.2d 405, 409 & n.15 (5th Cir. 1966)[5], whether an insured's alleged breach of post-loss duties bars recovery may be subject to a different analysis depending upon what particular act or omission has been raised by the insurer.   For example, where an insurer attempts to avoid coverage obligations based upon a defense that its insured breached a "cooperation clause," the insurer has the burden not only to show that the insured's failure or refusal to cooperate was "material and substantial," but also that the insurer suffered prejudice as a result.   *See Ex parte Clarke*, 728 So. 2d 135, 141 (Ala. 1998); *Williams v. Alabama Farm Bureau Mut. Cas. Ins. Co.*, 416 So. 2d 744, 746 (Ala. 1982); *Home Indem. Co. v. Reed Equip. Co.*, 381 So. 2d 45, 48 (1980); *Auto-Owners Ins. Co. v. Rodgers*, 360 So. 2d 716, 719 (Ala. 1978).   By contrast, Alabama courts generally do not require a showing of prejudice, for example, where an insured fails to give notice of a claim as specified by the policy, which is considered a condition precedent to the insured's recovery.   *See Reed Equip. Co.*, 381 So. 2d at 49 & n.3; *American Fire & Cas. Co. v. Tankersley*, 270 Ala. 126, 116 So. 2d 579 (1959); *see also Midwest Employers Cas. Co. v. East Ala. Health Care*, 695 So. 2d 1169, 1172 & n.5 (Ala. 1997).   Although it might be argued that the issue has not been expressly decided, Alabama courts do not seem to require a specific showing of prejudice where an insured has failed to comply with a policy requirement that the insured submit to an examination under oath.   *See Nationwide Ins. Co. v. Nilsen*, 745 So. 2d 264, 267 (Ala. 1998)[6]; *Akpan v. Farmers Ins. Exch., Inc.*,

---

[5]    The decisions of the former Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh Circuit.   *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[6]    In *Nilsen*, the Court held that the insurer was entitled to summary judgment on the insured's claim alleging breach of the policy on the ground that the insured had refused to submit to an examination under oath, which the court interpreted as a "strict condition precedent to [the insurer]'s liability under the contract."   745 So. 2d at 266-67.   The Court also rejected the insured's argument he had adequately performed his obligation by submitting to a deposition after filing the action.   *Id.* at 268.   In its opinion, the Court nowhere discussed or even

961 So. 2d 865, 872 (Ala. Civ. App. 2007). The Alabama Supreme Court has acknowledged the differing treatment of the prejudice element in the "cooperation" cases and the "notice" cases, explaining that the higher burden on the insurer is justified in the former because cooperation clauses often "impose broad, vague requirements, which in the absence of legally applied standards, would put into doubt the contractual obligations between insurer and insured in nearly every case," whereas "the requirement that the insured give timely notice to his insurer is specific and, in most cases, easily complied with." *Reed Equip.*, 381 So. 2d at 49 n.3. QBE does not here claim that BMCP failed to provide timely notice of the claim nor that BMCP refused a request to submit to an examination under oath, but to the extent that the parties rely upon cases that were resolved based on such failures by an insured, it may be important to keep in mind what showing the courts were requiring the insurer to make with respect to a particular post-loss duty.

One of QBE's principal claims is that BMCP is precluded from further recovery based upon BMCP's failure to provide a signed, sworn POL regarding the remaining disputed items of damage or loss. At times, the parties seem to analyze this issue as simply another part of the "cooperation" question and at other times as one separable from it. Alabama courts have treated proof of loss as having particular significance as a trigger of the insurer's duty to process and investigate the claim. *United Ins. Co. of Amer. v. Cope*, 630 So. 2d 407, 412 (Ala. 1993) (insurer had no duty to investigate claim until insured complied with policy requirement to submit written proof of the extent of the loss); *cf. George v. Associated Doctors Health & Life Ins. Co.*, 675 So. 2d 860, 862-63 (Ala. 1996)

---

mentioned the element of prejudice to the insurer except in an apparent rejection of *Puckett v. State Farm General Ins. Co.*, 314 S.C. 371, 444 S.E.2d 523 (1994), which was characterized as "holding that provisions of an insurance policy requiring the insured to submit to examinations under oath were not strict conditions precedent and that it was a question for a jury as to whether the insurer was prejudiced by the insured's alleged failure to submit to examination under oath, where the insured did submit to a deposition after commencing litigation." *Nilsen*, 745 So. 2d at 267.

(affirming summary judgment on insured's contract claim where it was undisputed that the insurer "did not receive the paperwork necessary for it to pay" claim, notwithstanding insured's assertion that he had "demanded" payment before filing suit).   Alabama courts also have treated POL requirements similar to those regarding notice, treating compliance with each as a "condition precedent" to recovery by the insured.   *See Lee v. Prudential Ins. Co.*, 812 F.2d 1344, 1346 (11th Cir. 1987); *American Fire & Cas. Co. v. Burchfield*, 285 Ala. 358, 363-64, 232 So. 2d 606, 611 (1970); *Occidental Life Ins. Co. of Cal. v. Huff*, 42 Ala. App. 156, 157, 156 So. 2d 380, 381 (1963); *Vardaman v. Benefit Ass'n of Ry Employees*, 263 Ala. 236, 240, 82 So. 2d 272, 275-76 (1955); *Central City Ins. Co. v. Oates*, 86 Ala. 558, 6 So. 83, 84-85 (1889); *see also generally Pan Am. Fire & Cas. Co. v. DeKalb-Cherokee Counties Gas Dist.*, 289 Ala. 206, 214, 266 So. 2d 763, 771 (1972) ("It has been generally held that the purpose of a provision for such notice and proof of loss is to allow the insurer to form an intelligent estimate of its rights and liabilities, to afford it an opportunity for investigation, and to prevent fraud and imposition upon it.")   Moreover, they have stated that, unless waived or excused, the insured's failure to provide a valid proof of loss before filing suit provides a complete defense to the action, and they have done so without indicating that an insurer must show prejudice.   *See Huff*, 42 Ala. App. at 157, 156 So. 2d at 381; *American Liberty Ins. Co. v. Burch*, 42 Ala. App. 31, 32-33, 151 So. 2d 405, 406-407 (1963); *Equitable Life Assur. Soc. v. Dorriety*, 229 Ala. 352, 157 So. 59, 63 (1934); *American Ins. Co. v. Porter*, 25 Ala. App. 250, 251-52, 144 So. 129, 130 (1932); *Oates*, 86 Ala. 558, 6 So. at 84-85.

Thus, because Alabama law treats proof of loss requirements as distinct and appears to subject them to different standards than those applicable to cooperation clauses generally, the court will analyze QBE's proof-of-loss arguments separately.   *Cf. Hall v. Liberty Mut. Fire Ins. Co.*, 2009 WL 235640,

at *3 & n.4 (11th Cir. Feb. 3, 2009) (unpublished) (recognizing, in a case decided under Georgia law, that although there was a material fact with respect to whether the insurer had waived a POL requirement, the insurer was entitled to prevail because the insured "failed to comply with other contractual prerequisites to suit," including those related to cooperation and document production); *Swaebe v. Federal Ins. Co.*, 2010 WL 785995, at *2-3 (11th Cir. March 10, 2010) (unpublished) (holding that, under Florida law, insured breached theft policy, barring recovery, by bringing suit before furnishing a signed proof of loss, notwithstanding that she had provided statements to the insurer by telephone, was examined under oath, and produced other documents on her claim).

### A.    Proof of Loss (POL) Requirements

QBE maintains that it is entitled to a declaration relieving it of any further liability on the Policy based upon BMCP's failure to provide a signed and sworn POL regarding the disputed portions of its claim.  Alabama has long recognized that the condition in an insurance policy that an insured must render a signed and sworn proof of loss is a material part of the contract, and compliance therewith is a prerequisite to the right of recovery by the insured unless such proof is waived by the insurer.  *See Ray v. Fidelity-Phoenix Fire Ins. Co.*, 187 Ala. 91, 65 So. 536, 538 (1914); *Oates*, 86 Ala. 558, 6 So. at 84; *see also* 13 Couch on Ins. § 189:103 (3d ed. 2005) ("Requirements that proof of loss be under oath are commonly found in a variety of insurance policies, especially those covering automobiles or other property.  Such a provision requiring that a proof of loss be signed and sworn to is reasonable and valid ... ." (footnotes omitted)).  QBE emphasizes that BMCP failed to submit a signed and sworn POL as it relates to any parts of the insurance claim that remain potentially disputed at this time.  QBE maintains that BMCP is therefore precluded from further recovering under the Policy.  BMCP responds by arguing that it sufficiently

complied with the POL requirements of the policy based upon its submission of the First POL and/or the March 2008 POL. The court thus turns to consider the sufficiency of each of those two proofs.

The First POL, which BMCP furnished in August 2006, was signed and sworn. However, both sides unmistakably treated that POL as only a "partial" proof, *i.e.*, as submitting a claim for only a portion of BMCP's loss. Based on the reports and correspondence of its adjuster, QBE clearly considered the First POL to apply only to the roof damage and to Servpro's initial clean-up work. Likewise, on the line on the form indicating that the amount of "THE WHOLE LOSS AND DAMAGE" was $117,761.05, Hackney drew a line through the word "WHOLE" and wrote above it the word "Partial" to make clear that he did not intend the POL to encompass the full amount of the loss. Further, it is undisputed that once BMCP furnished the signed and sworn First POL, QBE accepted it and immediately paid in full the amount claimed therein, with such payment being accepted by BMCP. Shortly thereafter, in early September 2006, QBE advised that it was willing at that time to pay an additional $97,577.66, upon BMCP's execution of the "Second POL" form, which was enclosed. QBE explained at that time that the Second POL form and payment pursuant thereto would cover the damage to the interior of the building and were based on an attached, itemized estimate. QBE also requested that BMCP forward an inventory on what QBE identified as the "final portion" of BMCP's claim, related to the building contents. It is undisputed that BMCP never provided a signed or sworn POL thereafter. In these circumstances, the First POL does not satisfy the condition that BMCP furnish a signed and sworn POL as it would relate to additional damage or amounts that might be subsequently claimed. *See Messa v. Omaha Property & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 529-530 (D.N.J. 2000) (where insureds submitted an initial POL making a claim for damage to property and insurer paid the amount claimed, insurer was entitled to summary

18

judgment on insured's claims for additional damage and amounts not claimed in the initial POL, based upon the insured failing to furnish a POL as to such other damage and amounts.); *Miller v. Selective Ins. Co. of Amer.* [No. 08-2296], 2009 WL 5033952, at *4 (D.N.J. Dec. 15, 2009) (unpublished) (same); *Stogner v. Allstate Ins. Co.*, 2010 WL 148291, at *3-4 (E.D. La. Jan. 11, 2010) (unpublished) (same); *cf. United States Cas. Co. v. Perryman*, 203 Ala. 212, 82 So. 462, 466 (1919) (holding that insured, by giving proof of loss for specified period of disability, was not estopped from subsequently giving another proof for a longer period and recovering based on the later proof, where insurer "did not act upon first claim to its detriment or injury").

Turning to the March 2008 POL, BMCP admits that it was neither signed nor sworn. Nonetheless, BMCP argues that it is sufficient as is on the theory that the Eleventh Circuit's decision in *Lee* interprets Alabama law as mandating only substantial compliance with POL conditions. The issue in *Lee* was whether medical reports provided by the insured were sufficient to comply with a disability policy requirement that the insured furnish "due proof of loss." *Lee*, 812 F.2d at 1346. The court acknowledged that "the policy did not require that any particular form be used..., other than that the stipulation that it be in writing," and that it did not "define what would constitute an acceptable proof of loss." *Id.* Looking to governing Alabama law, the court recognized that "due proof" in this context is satisfied by any "'such a statement of facts, reasonably verified, as, if established in court, would prima facie require payment of the claim.' *Dorriety*, 157 So. at 62. The insured is not 'bound to comply with the condition with technical strictness, either as to time or manner of compliance.'" *Id.* Based on that standard, and "[a]bsent a more stringent requirement in the policy itself," *id.*, the court ruled that the district court's determination that the reports were

sufficient to give the insurer "'reasonable information as to the facts rendering it liable under the policy,'" *id.* (quoting *Dorriety*, 157 So. at 63), was amply supported.

In effect, BMCP urges that *Lee* reads completely out of a policy the "signed" and "sworn" requirements as they relate to a POL. The scope of *Lee* is far less expansive. While *Lee* supports the notion that a relatively relaxed, "substantial compliance" standard is used to judge the form and content of a proof of loss where the policy stipulation states only vaguely that the written proof supplied must be "due," the case does not address the effect of a policy condition expressly and unambiguously requiring a POL to be signed by the insured and made under oath. Indeed, the *Lee* court acknowledged that a different analysis and outcome might result were there "a more stringent requirement in the policy itself." 812 F.2d at 1346. "Except where a failure to comply would result in a disproportionate forfeiture, express contractual conditions must be literally performed or fulfilled, and the substantial performance doctrine does not apply." 17A Am. Jur. 2d, Contracts § 601 (footnotes omitted). A condition that a POL be signed by the insured is, like a notice requirement, "specific and, in most cases, easily complied with," *Reed Equip.*, 381 So. 2d at 49 n.3. Thus, it is not prone to being disputed based on the insurer's subjective estimation of whether the condition has been satisfied.

Even under a "substantial" compliance standard, the unsigned, unsworn March 2008 POL fails the test. "Substantial performance does not contemplate exact performance of every detail but performance of all important parts." *Mac Pon Co. v. Vinsant Painting & Decorating Co.*, 423 So. 2d 216, 218 (Ala. 1982). Notwithstanding that doctrine, Alabama courts enforce insurance policies as written if the terms are unambiguous, *Lambert v. Coregis Ins. Co.*, 950 So. 2d 1156, 1161 (Ala. 2006), and, as stated previously, they have recognized that an insured's failure to provide a POL that

20

is signed and sworn before filing suit will bar recovery unless the policy condition was waived or excused.  *See Ray* 65 So. at 538; *Oates*, 6 So. at 84; *cf. Porter*, 25 Ala. App. at 251-52, 144 So. at 130 (requirement that POL be in writing is due to be enforced unless waived).  The express policy requirements that a POL be signed by the insured and made under oath are of significant value to an insurer, because statements in a POL may subsequently bind the insured and thus protect against the imposition of fraud.  *Barnes v. State Farm Fire and Cas. Co.*, 623 F. Supp. 538, 540 (E.D. Mich. 1985); *see also* 17A Couch Ins. 3d, § 253:135.  Under Alabama law, statements in a proof of loss are prima facie evidence of the facts stated therein as against the insured and are conclusive unless explained, avoided, or rebutted.  *Green v. Mutual Ben. Health & Acc. Ass'n*, 267 Ala. 56, 58, 99 So. 2d 694, 696 (1958).  Thus, "the mere omission of a signature on an otherwise complete proof of loss statement can be fatal to a 'substantial compliance' defense because its omission so significantly hinders an insurer's ability to protect itself against fraud."  *Westfield Ins. Co. v. Appleton*, 132 Fed. Appx. 567, 575 (6th Cir. 2005) (unpublished) (citing *Barnes, supra*).  Because the March 2008 POL is not signed by the insured or made under oath, QBE's ability to use it as impeachment against BMCP in any subsequent litigation is materially compromised, subverting an important policy supporting the requirement of a signed and sworn POL.  *See Barnes*, 623 F. Supp. at 540.  Accordingly, the court concludes that the March 2008 POL, like the First POL, does not satisfy the policy requirement that BMCP furnish a signed, sworn POL.

The conclusion that BMCP has not furnished a valid POL with respect to disputed aspects of the claim leaves unanswered the question of what consequences follow from BMCP's failure in that regard.  QBE seems largely to assume that the result is necessarily that it is relieved of further policy obligations.  However, the issue is not so simple.  All of the cases that QBE cites in support

of summary judgment based on the failure to provide a valid POL involved a claim brought by an insured for breach of the policy. *See Brooks v. U.S. Xpress, Inc.* [No. 07-0343-CG-C], 2008 WL 1756494 (S.D. Ala. Apr. 14, 2008) (unpublished); *Brown v. Commonwealth Life Ins. Co.*, 22 F. Supp. 2d 1325 (M.D. Ala. 1998); *Sanz v. U.S. Sec. Ins. Co.*, 328 F.3d 1314 (11th Cir. 2003); *Jenkins v. United States Dep't of HUD*, 780 F.2d 1549 (11th Cir. 1986); *Dawkins v. Witt*, 318 F.3d 606 (4th Cir. 2003); *Mancini v. Redland Ins. Co.*, 248 F.3d 729 (8th Cir. 2001); *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386 (9th Cir. 2000); *Gowland v. Aetna*, 143 F.3d 951 (5th Cir. 1998); *Phelps v. Fed. Emergency Mgmt. Agency*, 785 F.2d 13 (1st Cir. 1986). As such, the insured in each was not entitled to recover because the policy's POL requirement, whether framed as a condition precedent to the insurer's liability or to the insured right to bring suit, had not been satisfied at the time of the court's decision. Had BMCP filed this action against QBE seeking damages for breach, it might be assumed that the same outcome would follow, with BMCP's claim being subject to dismissal. But that is not the issue now before the court because BMCP has brought no action on the policy. Rather, it is QBE that seeks a declaration to bar BMCP from *ever* filing an action for breach, regardless of what curative actions BMCP might later undertake. In other words, the question here is not simply whether QBE's obligation to *pay* has been triggered; it is instead whether QBE is to be *discharged* from further obligation despite the possibility that BMCP might subsequently offer to furnish a valid POL and otherwise comply with policy provisions regarding post-loss duties before pursuing its own action on the policy. *Cf. Hopkins v. Lawyers Title Ins. Corp.*, 514 So. 2d 786, 788 (Ala. 1986) (holding that service upon the insurer of a copy of the complaint alleging breach of title policy substantially complied with policy's written notice requirement, despite insurer's claim that notice was a condition precedent to the insured's right to file suit) (overruled on other grounds, *State Farm*

22

*Fire & Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998)); *Ridglea Estate Condominium Ass'n v. Lexington Ins. Co.*, 415 F.3d 474, 480 (5th Cir. 2005) (holding that although insured's giving of notice six years after hail damage was unreasonable delay, under Texas law the insurer was not entitled to a declaratory judgment that it was not liable in the absence of a showing of prejudice from the delay); *U.S. Fid. & Guar. Co. v. Wigginton*, 964 F.2d 487, 491 (5th Cir. 1992) (acknowledging that, under Mississippi law, while an insured's refusal to submit to an examination under oath generally voids the policy even absent demonstrable prejudice, a reasonable delay in submitting may be excused).

As BMCP correctly observes, with the exception of *Brown* and *Brooks* which were decided under Alabama law, the many federal cases relied upon by QBE on the POL issue are also distinguishable on the ground that they involve claims under the federally-funded and regulated National Flood Insurance Program. *See Sanz,* 328 F.3d at 1315; *Jenkins,* 780 F.2d at 1550 & n.2; *Dawkins,* 318 F.3d at 608; *Mancini,* 248 F.3d at 731; *Flick,* 205 F.3d 387-88; *Gowland,* 143 F.3d at 952; *Phelps,* 785 F.2d at 14. Federal courts have strictly interpreted that program as requiring insureds to provide a proof of loss not only before filing suit but also within 60 days after the loss. *Sanz*, 328 F.3d at 1317-19; *Dawkins*, 318 F.3d at 612; Mancini, 248 F.3d at 734 n. 2; *Flick*, 205 F.3d at 391-92; *Gowland*, 143 F.3d at 954; *Phelps*, 785 F.2d at 19. The policy in the case sub judice similarly required BMCP to furnish a signed and sworn POL to QBE within 60 days of a request by QBE, which BMCP did not do. It is not clear that QBE is actually claiming that the failure of BMCP to comply specifically with the 60-day time limit entitles QBE to prevail. But even if QBE is making such an argument, Alabama courts do not strictly enforce policy time limitations regarding the furnishing of a POL in the absence of a clause clearly providing that the penalty for failing to comply

23

is forfeiture of coverage.  *See Burchfield*, 285 Ala. at 363, 232 So. 2d at 610; *Westchester Fire Ins. Co. of New York v. Green*, 223 Ala. 121, 134 So. 881, 885 (1931); *American Nat. Bank & Trust Co. v. U.S. Fid. & Guar. Co.*, 7 F. Supp. 578, 579 (S.D. Ala. 1934).  Instead, the failure to make proof in the time designated only postpones the maturity of the insured's right of action until the proof has been made.  *Green*, 223 Ala. 121, 134 So. at 885; *Prudential Ins. Co. v. Gray*, 230 Ala. 1, 159 So. 265, 266 (1934).  The policy here does provide that coverage is "void" if the insured intentionally conceals or misrepresents a material fact concerning a claim.  (Policy, "Commercial Property Conditions," § A(4)).  However, QBE has not directed the court's attention, and the court's own review of the Policy does not reveal, a provision expressly providing for forfeiture in the event that the insured fails to comply with the 60-day time limit for furnishing a POL.

That is not to say that Alabama law puts no bounds upon the time in which an insured must furnish a POL.  The Alabama Supreme Court has indicated, rather, that an insured is required to furnish a POL "within a reasonable time and before suit is begun." *Equitable Life Assur. Soc. v. Hill*, 230 Ala. 505, 161 So. 800, 801 (1935); *see also All States Life Ins. Co. v. Steward*, 242 Ala. 258, 262, 5 So. 2d 784, 787 (1942) (holding that even assuming that proof of disability could be furnished after the policy lapsed, the insured could not recover because "in no event was proof furnished within a reasonable time"); *Vardaman*, 263 Ala. at 239, 82 So. 2d at 275 ("[T]he delay of the proof [of disability] not extending beyond a reasonable time ... did not cut off the claim, though the proof was not furnished until after there was default in paying the subsequent premium." (quoting *Gray*, 230 Ala. 1, 159 So. at 266); *Metropolitan Life Ins. Co. v. Brown*, 27 Ala. App. 602, 603-04, 177 So. 178 (1937) (approving instruction directing a finding for insurer based upon its defense that insured took "too long and waited an unreasonable time" before furnishing proof of loss, although disability

policy was silent on the time for doing so, unless the jury found that the insurer had waived the defense); *Fire Ins. Co. v. Felrath*, 77 Ala. 194 (1884) ("It is laid down in the books, that when notice and preliminary proofs of loss are served within a reasonable time, then the insurance company must answer within a reasonable time afterwards."), overruled on other grounds, *Capital City Ins. Co. v. Jones*, 128 Ala. 361, 30 So. 364 (1900)); *see generally Aldridge v. Dolbeer*, 567 So. 2d 1267, 1268 (Ala. 1990) ("When a contract states that an act is to be done but no time is prescribed for its performance ..., the law requires that the act be done within a reasonable time.")

Whether a POL was furnished before suit or, in modern terms, a civil action, is begun is unimportant here, for, again, BMCP has not brought an action on the Policy.  There is a substantial question, though, on whether BMCP has at this point waited too long and delayed unreasonably in failing to furnish a valid POL as it relates to any additional damage or claimed loss.  In the related context of giving notice of a claim or loss, Alabama law provides that determining whether a delay by the insured is reasonable is based upon all of the attendant circumstances, in light of two factors: (1) the length of the delay and (2) the reasons for the delay.  *U.S. Fid. & Guar. Co. v. Baldwin County Home Builders Ass'n, Inc.*, 770 So. 2d 72, 75 (Ala. 2000); *Progressive Specialty Ins. Co. v. Steele ex rel. Steele*, 985 So. 2d 932, 937 (Ala. Civ. App. 2007); *see also Steward*, 5 So. 2d at 787-88 (analyzing the reasonableness of the circumstances underlying the delay in furnishing proof of disability).  While the reasonableness vel non of a delay is generally a question to be resolved by the trier of fact, the issue may be decided as a matter of law where the evidence and the reasonable inferences therefrom are susceptible to only one reasonable interpretation.  *Southern Guar. Ins. Co. v. Thomas*, 334 So. 2d 879, 882-83 (Ala. 1976); *Canadyne-Georgia Corp. v. Continental Ins. Co.*, 999 F.2d 1547, 1555 (11th Cir. 1993).

The length of the delay here is substantial.  QBE first requested in early September 2006 that BMCP sign and return a POL that QBE had prepared (*i.e.*, the Second POL), as well as an inventory associated with additional items of loss or damage.  QBE repeatedly and consistently thereafter attempted by various means to contact Hackney about completing the Second POL, but the record shows without dispute that he failed to respond until April 2007 and July 2007, at which times he merely asked that the Second POL and other paperwork be resent to him.  After QBE's adjuster complied with those requests, Hackney again failed to respond to still more attempts by QBE to communicate with him about the Second POL and the status of BMCP's claim.  When BMCP finally did send a POL in March 2008, it was unsigned, unsworn, and unaccompanied by any documentation.  Accordingly, BMCP *still* has not furnished a signed, sworn POL relative to any additional loss or damage, so the delay, now well over three years since QBE's first request, continues to lengthen.

Nor has BMCP offered a satisfactory reason or excuse for such failure and delay.  Hackney testifies that he did not sign the Second POL because he had "concerns" that it would be considered by QBE "as the whole loss and damage being claimed by BMCP," that the accompanying estimates lacked several items that Hackney thought still had to be repaired, and that he questioned the validity of the estimate.  (Hackney Aff. ¶ 12).  As to Hackney's alleged first "concern" above, the letter that accompanied the Second POL made clear that it related only to the "put back" work for the building interior and was based upon an itemized estimate.  That correspondence also clearly advised that QBE was still adjusting the "final portion" of BMCP's claim, related to the building contents and asked Hackney to supply an inventory as to such items.  But even assuming Hackney did harbor such "concerns," the record does not support that he ever told QBE or its adjuster that he was refusing to

sign the Second POL because of them or that he would sign a different POL.  Indeed, the evidence supports that Hackney received the Second POL and even asked for more copies of the same document to be sent to him in both April and July of 2007, but he thereafter refused to execute the form or otherwise communicate with QBE about the claim.  When Hackney finally sent the March 2008 POL, it was unsigned.  When it was rejected by QBE on that basis and others, BMCP never attempted to furnish another POL to correct that deficiency or any other asserted.  BMCP offers no reason for failing to do so.  Based on the length of the delay and the lack of a valid excuse therefor, the court concludes that BMCP's delay in furnishing a signed POL as to additional items of loss or damage, as required by the Policy, was unreasonable as a matter of law.   Accordingly, BMCP's failure to furnish a signed POL within a reasonable time would preclude recovery on the policy, entitling QBE to summary judgment on its claim for a declaratory judgment. *See Steward*, 242 Ala. at 262, 5 So. 2d at 787-88; *Brown*, 27 Ala. App. at 603-04, 177 So. 178.

### B.    Other Failures of Cooperation

Even assuming that the failure of BMCP to provide a signed POL would not alone entitle QBE to summary judgment, the record establishes that BMCP also materially breached other post-loss duties of cooperation.  An insurer may be relieved of its coverage obligations where its insured breaches a policy condition requiring the insured to cooperate in the insurer's investigation of the claim. *Williams v. Alabama Farm Bureau Mut. Cas. Ins. Co.*, 416 So. 2d 744, 746 (Ala. 1982); *Watts*, 370 F.2d at 410.  However, an "insurer 'cannot avoid its obligations on this ground' unless the insured's failure to cooperate 'is both material and substantial.' " *Ex parte Clarke*, 728 So. 2d 135, 141 (Ala. 1998) (quoting *Home Indem. Co. v. Reed Equip. Co.*, 381 So. 2d 45, 48 (1980); *Alabama Farm Bureau Mut. Cas. Ins. Co. v.  Teague*, 269 Ala. 53, 56-58, 110 So. 2d 290, 293-94

(1959)).  "The "test for determining what is material and substantial with respect to an insured's alleged failure to cooperate" amounts to a "requirement of prejudice to the insurer." *Williams*, 416 So.2d at 746; *see also Home Indem. Co.*, 381 So. 2d at 48 (holding that determination that noncooperation was material and substantial requires a showing of prejudice).  Non-cooperation is deemed prejudicial if the failure to cooperate "negate[s] the only evidence the insurer could offer in defense," *Williams*, 416 So. 2d at 747, "or the insurer is deprived of the opportunity to conduct an investigation and mount a defense."  *Colorado Cas. Ins. Co. v. The Kirby Co.* [No. 2:05-cv-178-CSC], 2008 WL 149996, at *4 (M.D. Ala. Jan. 14, 2008) (unpublished); *see also Watts*, 370 F.2d at 411.  The burden to establish the insured's failure to cooperate and resulting prejudice lies with the insurer.  *Clarke*, 728 So. 2d at 141.

One cannot reasonably conclude other than that BMCP substantially failed to cooperate with QBE in its attempts to further investigate the claim.  The record establishes that, after settling the first part of the claim related to repair of the building roof and Servpro's initial clean up work, QBE made repeated, good-faith attempts to contact BMCP to obtain necessary documentation and information on those aspects of BMCP's claim that remained outstanding.  Specifically, QBE made clear that it was looking for BMCP to sign and return the Second POL form with respect to the ""put back of the interior areas" of the building, based on estimates that the adjuster had obtained for such work, plus a "detailed listing of the damaged contents along with invoices or receipts documenting values." (BMCP Exh. B).  With respect to the contents, QBE further advised that for any item with a claimed value of more than $500 QBE would "need proof of its value, such as quotes for replacement, catalog pages and/or photos."  (BMCP Exh. C).  QBE began looking for BMCP to provide such documentation and information in early September 2006, with communication efforts

continuing each month thereafter, but BMCP failed to provide anything at all on these aspects of the claimed loss for more than a year and a half later, when its attorney furnished the unsigned, unsworn March 2008 POL with an accompanying "Itemized List of Loss." After receiving those materials, the insurer timely and expressly rejected that POL on the grounds that it was both unsigned and "indicates an amount of damages that are grossly higher than the damages identified in our original inspection." (QBE Exh. I). Indeed, the Second POL suggested that QBE had assessed the value of the claim as it related to repairing the building interior at $97,577.66, based upon a replacement cost of $120,180.57. (QBE Exh. B5). By contrast, BMCP's claim for similar work reflected in the March 2008 POL appeared to be based on a replacement cost of $300,000,[7] and BMCP also claimed additional losses totaling well over $300,000. In support of its claims in the March 2008 POL, BMCP did not include a copy of an estimate from any contractor, nor did it supply any documentation relating to the building contents or how BMCP arrived at the values it assigned to them. The insurer responded that BMCP's damage amounts could not be accepted without further investigation, recognizing that it was imperative that Hackney, BMCP's representative, be "available for further inspections, discussions and verification of damages," to include an inspection of both the building and "all items of personal property, claimed to be damaged." (QBE Exh. I). During the six months that followed, QBE made multiple attempts to schedule an inspection meeting with Hackney, his counsel, and a contractor of Hackney's choice but Hackney, quite simply, ignored all

---

[7]    The estimate for repair and replacement of the interior and exterior associated with the March 2008 POL is listed as $247,000, and there are additional claims of $15,300 for "specialized" electrical and painting work, and another $35,000 to "replace approximately 250 ft. of base and wall cabinets." The estimate of the replacement cost as stated in the Second POL ($120,180.57) specifically encompasses sums for cabinetry, electrical, and painting, although it does not list a number of items appearing on the March 2008 POL, including plumbing work ($3,000) and several exterior items of unspecified cost (three awnings, broken windows, gutters, and downspouts).

of them and never responded.  Even now, BMCP offers no excuse for that failure.  Under the circumstances, QBE was entitled to investigate the claim further, particularly in light of BMCP's inordinate delay in responding to QBE's repeated attempts to contact him previously about the claim. The court concludes that BMCP's wholesale, unexcused inaction and delay in the face of reasonable attempts by QBE to meet, inspect the property, and investigate the claim further constitutes a substantial and unreasonable failure to cooperate as a matter of law.  *See Hillery v. Allstate Indem. Co.*, ___ F. Supp. 2d ___, ___, 2010 WL 1382573, at *15-16 (S.D. Ala. April 2, 2010) (granting summary judgment to insurer based upon lack of cooperation by insureds who refused to provide additional documentation or information on items of property allegedly destroyed by fire); *State Farm Fire & Cas. Co. v. Richardson*, 2008 WL 4531765, at *5-8 (S.D. Ala. Oct. 9, 2008) (unpublished) (granting declaratory judgment for fire insurer based upon insured's lack of cooperation where he refused to provide written responses to questions regarding the circumstances of the loss, refused repeated attempts by the insurer to interview him to take a statement, refused to provide documents related to the premises); *Hall*, 2009 WL 235640, at *2-3 (holding, under Georgia law, that insured breached cooperation condition of fire policy where he failed to provide any documents requested by insurer, not just those he had previously claimed were destroyed or unavailable); *cf. Turner*, 681 So. 2d at 591-92 (holding that insured's failure to cooperate provided a valid ground to deny the claim on fire policy so as to defeat bad faith claim, where he refused to answer questions concerning his income or how much he paid for the building, failed to return any verification of the questioned contents of the building, refused to allow his wife to give a sworn statement, refused to answer questions under oath or to sign a financial information release form).

BMCP urges, however, that summary judgment is not appropriate on the theory that, even if BMCP did not cooperate, QBE has failed to show that it suffered prejudice as a result.  The court disagrees.  It might be assumed that QBE did not suffer material prejudice from the inordinate delay in being unable to process aspects of the claim initially, occasioned by BMCP's failure to execute paperwork or communicate any material information to QBE between September 2006 and returning the unsigned March 2008 POL.  Despite delays caused by BMCP for those eighteen months or so, there is no dispute that BMCP's property had suffered substantial, covered losses from the hail storm and that QBE had received prompt notice and was able to perform preliminary investigation at the site within about one week of the loss.  Further, QBE's adjuster continued to solicit BMCP to return proofs of loss and other necessary information on the claim, suggesting that QBE still believed the claim could be resolved notwithstanding the many months that BMCP essentially ignored the matter.  Nonetheless, once BMCP finally responded with the unsigned March 2008 POL, QBE was entitled under the policy to further investigate the damage, losses, and amounts claimed therein by BMCP.  With respect to the building contents, BMCP never provided QBE with any documentation to substantiate either the existence or value of any of the items claimed on the March 2008 POL.  It is also undisputed that, following the storm in April 2006, the building itself lay vacant, unsecured, and its condition continued to deteriorate in the months and years after QBE paid that portion of the claim represented by the First POL in August 2006.  BMCP argues that it was not at fault for its inability to furnish documentation on the contents and the continuing deterioration of the building.  But assuming that to be true, those circumstances obviously made it imperative that QBE be able to meet with Hackney to discuss the claim and conduct an inspection of both the building and the items of property allegedly damaged.  When QBE employed reasonable, good-faith means to arrange such

31

a meeting and inspection after receiving the March 2008 POL, however, QBE's efforts were completely stymied by BMCP's de facto, unexplained refusal over the ensuing months to meet with QBE's adjuster for an inspection of the building or the personal property claimed to have been damaged or lost.  Accordingly, the court concludes that the record shows without dispute that QBE has been materially prejudiced in that it was thwarted from evaluating and verifying what particular damage and items were covered and the value of same.  Because BMCP's failure to cooperate in QBE's investigation of the claim was substantial and material, resulting in prejudice to QBE, the court concludes that QBE is also entitled to summary judgment on this ground as well.

## IV.    CONCLUSION

Based on the forgoing, the undersigned recommends that QBE's motion for summary judgment (Doc. 16) is due to be **GRANTED** and that QBE is entitled to a declaratory judgment that it has no further policy obligations to BMCP with regard to the loss at issue in this case.  A separate final order will be entered.

As to the foregoing it is SO ORDERED this the 19th day of April, 2010.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE

32